UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

───────────────────────────────────────────────────────────

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                    Case No. 16-CR-175

YOSVANY PADILLA-CONDE,

        Defendant.

───────────────────────────────────────────────────────────

DEFENDANT'S SENTENCING MEMORANDUM

───────────────────────────────────────────────────────────

      Defendant Yosvany Padilla-Conde comes before the Court for sentencing having been convicted of aiding and abetting Jason Ludke's fanciful attempt to travel to the middle east to join ISIL. The PSR dutifully applies the terrorism guidelines and enhancements, resulting in a guideline range far in excess of the statutory maximum penalty for the crime of conviction. Padilla-Conde asserts that the Court should give little regard to those guidelines on policy grounds, and that a sentence of 33 months imprisonment is sufficient but not greater than necessary to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

BACKGROUND

      Yosvany Padilla-Conde is not a terrorist. He is not a radical Muslim. He does not support terrorism. Padilla-Conde was brought to the United States as a child from his native Cuba after his father was shot to death and his mother re-married. His childhood experience in his new home was traumatic. His mother engaged in serial marriages, often to men who were abusive to her and Padilla-Conde. Her relationship choices subjected a young Padilla-Conde to constant abuse and upheaval. Throughout his youth he variously lived in Milwaukee, Las Vegas, Louisville, Cleveland, and Florida. His abysmal home life caused him to run away multiple times. On one such occasion while living in

Louisville, Padilla-Conde was picked up by a taxi driver who offered to help him, then sexually abused. He ultimately ran away from home while in Cleveland, making it to Milwaukee where he was placed in foster care. When his mother learned he was here, she joined him in Wisconsin. By then it was too late. Padilla-Conde was barely into his teens, using alcohol and drugs and committing robberies with BB guns. It is no surprise at all, given this background, that Padilla-Conde developed mental health and substance abuse issues. While his mother has recently described him as a kind, decent, and caring person—qualities I have observed in him in my nearly 3 years of representation—depression, schizophrenia, and his coping mechanism of alcohol and drug abuse obscured those characteristics as he moved from juvenile delinquency and detention to adult prison in his late teens.

Adult prison is where he met Jason Ludke. Ludke, with no shortage of his own mental health issues (See Dkt. #99, generally), took the younger Padilla-Conde under his wing, and Padilla-Conde, who was raised Catholic, joined Ludke's recent religious conversion to Islam. Over time, their views of the world through the prism of Islam diverged. Ludke professed to follow a radical ideology, while Padilla-Conde rejected such readings of the Quran.

All in all, as he became an adult in the penal system, Padilla-Conde appeared to making positive gains in maturity and his ability to cope with his mental health issues. He spent some of his incarceration at the Wisconsin Resource Center, getting treatment for his mental health issues. When he was released into the community he was able to work, got married, and had a child. Employment was always tenuous for Padilla-Conde given his unusual immigration status—he was a man without a country. He could not become a lawful permanent resident or citizen given his conviction record, and he could not be removed to his home country of Cuba due to a lack of diplomatic relations between the countries. He was reliant on temporary work permits to be legally employed, which he did not always

have. His substance abuse issues returned when his wife began using marijuana. As a result, their marriage began to suffer. Then, Ludke re-appeared.

In 2016, Ludke, then on federal supervision, contacted Padilla-Conde seeking a place to stay. Given that Ludke was a registered sex offender arising from his 2002 conviction for sexually assaulting a child, Padilla-Conde's wife did not want him around. Padilla-Conde felt he could not deny his former friend and fellow Muslim a temporary place to stay. His wife felt differently and left, marking the beginning of the end of their marriage.

Ludke brought with him a significantly radicalized view of Islam. Over the course of the ensuing weeks, Padilla-Conde tried many times to convince Ludke that his extreme views were not consistent with true Islam. Agents confirmed with Padilla-Conde's wife (also a practicing Muslim) that Padilla-Conde did not hold any extreme or radical Islamic views. As Padilla-Conde's marriage disintegrated he was without work and unable to find a new job, and his house guest was relentlessly watching speeches by radical imams and scouring the internet and social media sites for like-minded people. Ludke was continuously talking about traveling overseas to the middle east to fight jihad. Padilla-Conde's efforts to convince him that this was not the true way fell on deaf ears.

Social media accounts and communications seized by the Government and included in the discovery in this matter showed that Ludke would tell anyone and everyone that he wanted to travel abroad and take up jihad. It is no surprise he was soon in contact with an undercover agent posing as an ISIL recruiter ("UCE") who was eager to facilitate Ludke's stated plans. Similar accounts belonging to Padilla-Conde showed many instances of him speaking out against radical Islam and terrorist groups.

Meanwhile, Padilla-Conde was looking for his own way out and a fresh start. He had been in communication with women in Texas and Brazil, discussing traveling to see and be with them. More concrete were his discussions with a local ex-girlfriend from Milwaukee. Padilla-Conde discussed his

3

intentions to travel to Mexico and start over, and she told him that he could potentially go to her grandparents' ranch in Monterrey to work. Padilla-Conde decided he would give it a try. When Padilla-Conde was arrested he told the agents the same thing, who then interviewed the ex-girlfriend and confirmed those discussions. The problem with Padilla-Conde's plan was that he could not just cross the border into Mexico legally at any port of entry. Padilla-Conde had no valid passport or ID, being a man without a country.

The UCE encouraged Ludke's stated intentions and offered assistance to him. In order to provide that assistance, the UCE required Ludke to record videos pledging allegiance to Abu Bakr al-Baghdadi and ISIL in order to convince his "brothers" that Ludke was for real and deserving of their help. Ludke was happy to oblige. When Ludke told the UCE that his "brother" Padilla-Conde was coming too, the UCE demanded the same type of video from Padilla-Conde. Ludke knew that Padilla-Conde's interest was to get to Mexico and work on the ranch, not travel to the middle east, but he implored Padilla-Conde to make the video and send it so they could get help crossing the border into Mexico. Padilla-Conde ultimately agreed, but what he provided wasn't good enough for the UCE. In fact, it took three separate tries for Padilla-Conde to make a video sufficiently incriminating in the UCE's view. In response to one of the videos in which Padilla-Conde stated he intended to go to Brazil, the UCE contacted Ludke to tell him that Padilla-Conde's video was no good and that he needed to make a new video showing that he knew "the plan." Many of these conversations between Ludke and the UCE took place after Ludke and Padilla-Conde were already en route to the border.

When Ludke and Padilla-Conde were arrested in Texas, Padilla-Conde explained all of this to agents, still believing at that time that the UCE was an actual ISIL recruiter. He offered to help agents identify and arrest that individual. He was then, just as he was when this journey started, a Muslim

4

Case 2:16-cr-00175-LA    Filed 08/01/19    Page 4 of 9    Document 117

without extremist views, a man without a country, an unemployed and estranged husband and father trying to get to Mexico to make a life. Nothing more.

He has been detained at the Waukesha County Jail since his arrest, a period of nearly 3 years. He has not stepped foot outside in that time. He has taken advantage of the meager programming available to him there[1], and has been a model inmate.

In the late summer into the fall of 2017, the Government began investigating claims that Ludke was talking to other inmates at the Dodge County Detention Center seeking to have the UCE killed. As part of this investigation, the Government sent a different undercover officer to visit Padilla-Conde at the Waukesha County jail. That officer held himself out as an associate of Ludke's who was seeking to help Ludke and Padilla-Conde by getting rid of the UCE before their trial.

Contrary to what the Government most certainly hoped, Padilla-Conde showed his true colors. After the undercover left the jail, Padilla-Conde immediately wrote a letter to him at the address he provided and told him:

> "I don't know if you're a muslim or not. Or how Jason got a hold of you. But I don't need the kind of help that you offered Jason. . . .Please don't contact me. And I would suggest the same to Jason. I don't know what you owe him or anything. But it is best to have piety of Allah, for he enjoins on righteousness and to forbid evil. As for me, I will be patient with what my Lord has for me, and ask only of him, for help. Once again don't contact me. And if you contact Jason, let him know what I said. I don't want to hear about this dumb talk. Get his mind straight. This is not what Islam is about. Peace."

This letter was intercepted by agents as part of their investigation and provided to the defense in discovery.

---

[1] Attached hereto as Exhibit 1 is a letter from Waukesha County Technical College instructor Lynn Spangler documenting Padilla-Conde's completed courses and a certificate of completion of the 36-hour anger management program.

5

## THE GUIDELINES

The terrorism guidelines are of little utility here. As counsel for Ludke ably and convincingly argued in their sentencing memorandum, §3A1.4 should be rejected on policy grounds. (See Dkt. #99, pp. 9-13) Guideline §3A1.4 and the enhancements that apply result in a guideline range of 360-life in every terrorism case regardless of the specific conduct and characteristics of the defendant. In other words, this guideline would treat Padilla-Conde—who is convicted of giving a ride to a hopeless, weaponless, online jihadi fantasist to meet a make-believe ISIL recruiter—the same as someone smuggling actual jihadists or weapons to actual terrorists. In this way the guideline runs contrary to the dictates of 18 U.S.C. § 3553(a) that sentences be individualized and proportionate. This Court accepted Ludke's arguments that guideline §3A1.4 should be rejected. (Trans. 3/4/19 Sentencing at pp. at 22-24)[2] Padilla-Conde asserts that the same critiques and arguments apply with equal force here, and asks the Court to similarly reject the application of U.S.S.G. §3A1.4.

When the Court rejects the enhancements of §3A1.4 that make the guideline unworkable, we are left with a base offense level of 26 for the crime of conviction. After the reduction for acceptance of responsibility, the adjusted offense level is 23. Padilla-Conde has three criminal history points, placing him in criminal history category II. The resulting guideline range would then be 51-63 months. Padilla-Conde asserts that this sentencing range still reflects a sentence greater than necessary to achieve the purposes of sentencing, and that a sentence of 33 months is appropriate.

## 3553(a) FACTORS

---

[2] Concluding that §3A1.4 was created through congressional directive rather than through the sentencing commission's normal process of guideline adoption through empirical evidence and expertise, entitling it to less respect. Citing *United States v. Dorvee*, 616 F.3d 174 at 186-87 (2nd Cir. 2010); *United States v. Jumaev*, 2018 U.S. District Lexus 119916 at 28-29 (D. Colo. July 18, 2018); *Kimbrough v. United States*, 552 U.S. 85 at 109 (2007); *United States v. Reyes-Hernandez*, 624 F.3d 405 at 418 (7th Cir. 2010); and *United States v. Tesillos*, 965 F.Supp.2d 1037 at 1040-41 (E.D. Wis., 2013)

A.     The Nature and Circumstances of the Offense

As described in greater detail above, Padilla-Conde's offense was aiding and abetting Ludke's attempt to join ISIL. His conduct entailed giving Ludke a ride to the Texas-Mexico border. The purpose of Padilla-Conde's trip was not to chauffeur Ludke. He was intending to travel to Mexico and was hoping to be able to work at the ranch of his ex-girlfriend's grandparents. Ludke rode along in his quest to meet up with fictional ISIL collaborators who would somehow assist him in getting into Mexico and then to the middle east.

Padilla-Conde did not seek out contacts with extremists, Ludke did. Padilla-Conde did not communicate with the UCE posing as the ISIL recruiter, Ludke did. In all respects Padilla-Conde was a passive actor. There were no weapons. There was no violence. Padilla-Conde's conduct was as mitigated as one can imagine in a case of this nature.

B.     The History and Characteristics of the Defendant

As detailed above, Padilla-Conde had an awful childhood. He was brought from his home country of Cuba to the United States as a child after his father was murdered. His mother's procession of new boyfriends and husbands alienated and abused him. He had no stable residences, moving as frequently as his mother remarried. He ran away from home several times, in one instance resulting in his sexual abuse at the hands of an opportunistic predator who saw a vulnerable young boy away from home. He developed mental health issues and got involved in the juvenile justice system early, committing robberies with a BB gun. He was educated in the criminal justice system, first in juvenile detention and then in the adult prison system after an armed robbery conviction at age 17. In the latter case, Padilla-Conde acted as a lookout during the commission of an armed robbery, and was sentenced to 5 years in prison.

7

Padilla-Conde's unfortunate immigration situation made it difficult for him to find gainful employment. He had no lawful status here, and he could not (and cannot) be deported. He had periods of progress around the time of his marriage, but lapses in taking care of his mental health needs and regressing to substance abuse contributed to his difficulties. In general, Padilla-Conde's conversion to Islam was good. It was a positive influence in his life, brought him a sense of community, and he enjoyed attending the mosque which also, at times, provided him with needed assistance. Padilla-Conde did not subscribe to extremist views, and rejected the jihadist mentality. The only negative Padilla-Conde attaches to his conversion is that it is what tied him to Jason Ludke. Padilla-Conde looks back on the final weeks of his freedom with regret and shame. His feeling of allegiance to Ludke cemented the end of his marriage. He could not talk Ludke out of his views, and he allowed Ludke to convince him that he could use the ISIL recruiter—unbeknownst to them, the UCE—to help him get to Mexico. So he posed for pictures with Ludke and briefly behaved in a way that would make it appear he shared Ludke's views. When we reviewed that discovery material at the jail, Padilla-Conde shook his bowed head and cried.

Padilla-Conde is not a terrorist. He is not a danger to the community. He is 32 years old; his last conviction occurred when he was 17. He has made the most of his time at the Waukesha County Jail. He has completed 8 classroom courses, taking advantage of available programming.

Padilla-Conde has lost everything, most notably his wife and child. His name will forever be linked with the word "terrorist," though it does not describe who he is or what he has done.

C. <u>Appropriate Sentence</u>

In devising a sentence, the Court must consider the factors set forth in 18 U.S.C. §3553(a) and impose a sentence sufficient but not greater than necessary to satisfy the purposes of sentencing delineated in § 3553(a)(2): (a) to reflect the seriousness of the offense, to promote respect for the law,

and to provide just punishment for the offense; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. In addition, the Court must consider the need to avoid disparities in sentencing. 18 U.S.C. § 3553(a)(6).

This Court sentenced Ludke to 84 months imprisonment. Jason Ludke was clearly and indisputably the worse actor here, and is the one whose views and behaviors are most troubling. Padilla-Conde's conduct in this case was significantly mitigated as compared to Ludke. In addition, Ludke's criminal record was far worse than Padilla-Conde's. Further, Padilla-Conde has spent 33 months in confinement in county jail. Such conditions are extremely harsh, given the lack of access to programming and, even more basically, the outdoors. In light of these facts, Padilla-Conde's suggested sentence of 33 months presents a reasonable difference from Ludke's and sufficiently addresses the seriousness of the offense, deterrence, and protection of the public.

Dated at Milwaukee, Wisconsin, this 1st Day of August, 2019.

Respectfully submitted,

By: /s/ Craig S. Powell
Craig S. Powell
HART POWELL, S.C.
735 North Water Street, Suite 1212
Milwaukee, WI 53202
Telephone: (414) 271-9595
Telefax: (414) 271-3701
cspowell@kohlerandhart.com

9